## EXHIBIT D

**Manning Declaration in Support of Third Amended Chapter 11 Plan of Reorganization**

SGR/82145611.8

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

In re:                                                    Chapter 11

JVK Operations Limited, et al.,                 Case No.: 24-70799 REG

                                   Debtors.                  (Jointly Administered)

---------------------------------------------------------------- x

## DECLARATION OF JEFFREY R. MANNING, SR. OF THE SILVER BIRCH GROUP IN SUPPORT OF CONFIRMATION OF MODIFIED THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF JVK OPERATIONS LIMITED

I, Jeffrey R. Manning, Sr., hereby make this declaration (the "Declaration") pursuant to Section 1746 of title 28 of the United States Code and declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration.

2. I am the Founder and Senior Managing Director at The Silver Birch Group, Inc. ("Silver Birch") an investment banking firm located outside of Annapolis, MD. Silver Birch is the investment banker for JVK Operations Limited and JVK Operations Ltd. of New Jersey in connection with these chapter 11 cases. I have earned the following FINRA licenses: Series 7 (General Securities Representative), Series 63 (Uniform Securities Agent State Law), Series 24 (General Securities Principal), and Series 79 (Investment Banking Representative). It is my understanding that fewer than ten professionals qualify with both a FINRA Series 24 license and the Certified Turnaround Professional designation from the Turnaround Management Association.

3. Effective January 14, 2025, The Silver Birch Group, Inc. ("SBG") was retained by the court to act as the investment banker for JVK Operations Limited [Case No. 24-70799 (SPG)].

1

4.      I was asked by Debtor's counsel to provide my opinion as to value in connection with the New Value Test for the JVK Operations Limited Plan of Reorganization ("POR") in connection with confirmation.

5.      I submit this declaration in support the Modified Third Amended *Chapter 11 Plan of Reorganization of JVK NY* [Docket No. 262] (as amended, supplemented, or modified from time to time).

6.      The Statements in this Declaration are, except where specifically noted, (i) based on my personal knowledge or opinion, experience, review of relevant documents, and information concerning JVK NY (the "Debtor"); (ii) based on information I received from JVK NY, the Debtor's representatives, or agents of Silver Birch working under my supervision, direction, or control; and (iii) assume that the projections provided to me are reasonably accurate and prepared in good faith.

7.      I understand that this Declaration is intended to be submitted in lieu of direct testimony and that I will be subject to cross-examination.

**Background and Qualifications**

8.      Since beginning my corporate finance career over 40 years ago, I have worked in commercial banking, corporate finance, operating restructuring, value investing, fixed income trading, and investment banking. I hold a Bachelor of Arts in Economics and Political Science from Yale University, and a Master of Business Administration from Columbia University.

9.      Most recently, in 2024 I was recognized by The M&A Advisor §363 for my work as the "Outstanding Investment Banker" on Winc, Inc., a transaction selected as the "Sale of the Year". I have also been recognized as an "Outstanding Investment Banker" by Turnaround and Restructuring Magazine in 2017, 2018, 2020, and 2023, and over the past two decades I have

appeared regularly on *The Deal's* "League Tables." The Turnaround Management Association designates me as a Subject Matter Expert in two areas – Sale of Assets and Companies under the U.S. Federal Bankruptcy Code (§ 363 Sales) and Valuation in Bankruptcy.

10. During my career I have completed over 150 engagements. I have provided expert testimony in dozens of jurisdictions in the Federal U.S. Bankruptcy Courts, in addition to testimony and expert reports for United States Attorney's Offices on various matters in the S.D.N.Y. and E.D.N.Y, including the following cases: *Firstbase.io, Inc.,* Case No. 24-11647 (Bankr. S.D.N.Y.), *In re 4D Factory Inc., et al.*, Case No. 23-11618 (Bankr. S.D.N.Y.), *Bellridge Capital, LP v. EVMO, Inc.*, Case No. 1:21-cv-07091 (S.D.N.Y.), and *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (Bankr. D. Del.).

11. My compensation is not based upon my opinions.

12. I have no prior relationship or any conflict of interest with the Debtor.

### Relevant Facts

13. My understanding is JVK NY (the "Debtor") was founded in 2006. The Debtor is organized under the laws of the State of New York as "for profit" corporation. The Debtor is owned by Vinod Samuel and Michael Connell, who each hold 50% of the issued and outstanding shares of each of the Debtor. Prior to March 1, 2024 (the "Petition Date"), the Debtor was a leading provider of linen, scrubs and other garments in the tri-state area. The Debtor's business is a specialized one. It is one of three of the largest industrial/commercial linen launderers/providers in the tri-state area. The Debtor's core business is providing laundry services to hospitals and nursing homes in the New York metropolitan area. These are essential services for the hospitals to provide care to the patients they serve. The Debtor also services hotels and restaurants. The NY Debtor

operates its business at the following two locations: 130 New Highway, Amityville, NY 11701 and 166 New Highway, Amityville, NY 11701.

14.     The Debtor has approximately eight creditors asserting secured claims in this case asserting claims of approximately $5.0 million in the aggregate and approximately $21.0 million in non-insider claims, trade vendors, utility providers.

15.     At the request of JVK NY's counsel, Spence Law Office, P.C., SBG was asked to render an opinion to assess the best interests of creditors test ("Best Interest Test").  This test generally applies to individual dissenting holders of impaired claims, and is customarily satisfied by a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical Chapter 7 liquidation against the estimated recoveries under the proposed POR.

16.     The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical Chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the proposed plan of reorganization that rejects the plan.

17.     I was also asked to evaluate the "New Value" being provided in connection with the proposed $1.773 million cash infusion as outlined in the POR and JVK-MediServ Settlement based against the relevant test of new value plans in the Second Circuit.

18.     Any valuation exercise depends upon the methodology applied and the assumptions used. In my analysis, I used several broadly accepted methodologies, taken together the "Flash Valuation." Flash Valuation best estimates and reflects current capital market conditions and are used to guide a potential marketing process run by a competent investment banker to a broad investor/buyer universe over a reasonable period of time.  Flash Valuation attempts to address where

assets are likely to "trade." By comparing and contrasting several methodologies, Flash Valuation attempts to "triangulate" a consensus.  The work product is typically presented to a Board of Directors or Senior Management evaluating M&A activities or considering a capital market effort or liquidity event.[1]

19.     In addition to applying Flash Valuation methodologies, in this case I am fortunate to have had a fulsome marketing and auction process to form a benchmark for value. As famed academic Burton G. Malkiel noted, "Nobody knows more than the market," which is another way to say that an active market process always provide the most accurate measure of "value."[2]

20.     Pursuant to Court approved Bidding Procedures dated March 12, 2025 (ECF No. 193), Silver Birch assisted the Debtor marketing the Assets in a number of ways. In addition to published notice on an industry website, the business social media site LinkedIn generated 1,150+ "impressions" noticing the sale, generating several reverse inquiries from possible bidders.

21.     Silver Birch contacted and served by telephone and email notice of Auction Sale, Order approving the Terms and Conditions of Sale, and approved Terms and Conditions to over forty (40) prospective purchasers, including strategic and private equity buyers. Strategic buyers included key industry contacts interested in the tri-state New York market.

22.     Going into the final marketing week six parties were conducting active due diligence. Ultimately two submitted Qualified Bids at the Bid Deadline. The Auction was held on April 8, 2025, and by the end of the day, in Debtor's considered business judgment, the "highest and best"

---

[1] Reference the Silver Birch New Value Report dated November 26, 2025 for further explanation on Flash Valuation, including its use in other Chapter 11 cases over several years.

[2] See further "Res tantum valet quantum vendi potest. (A thing is worth only what someone else will pay for it.)" Malkiel, Burton Gordon, A Random Walk Down Wall Street: The Time-Tested Strategy for Successful Investing, W. W. Norton & Company, Inc., 1973.

alternative generated $5.387 million for JVK NY, including approximately $5.0 million in senior debt – with the majority of this senior debt reflecting negotiated compromise between sophisticated parties. The active marketing process at auction improved potential recoveries to the Debtor estate in excess of 12%.

23. Based upon my 40+ years if corporate recovery experience, I believe that the marketing of this opportunity was conducted with a broad market test, in good faith, and on an arms-length basis. (See, Declaration regarding results of auction at ECF 201).

24. Silver Birch relied on internal financial projections, a review of the industry, and a review of relevant economic conditions in preparing its Flash Valuation.

**Valuation of the Debtor**

25. As the Silver Birch New Value Report shows on *chart 1* (page 10), the valuation methodologies used yield several ranges of value. The result obtained at auction of $5.387 million is a strong guide of value. Aggregating the $1.773 million in fresh cash equity and the $5.127 in Total Secured Debt produces $6.900 million in the POR, plus the POR provides $0.225 million for Administrative Professional Fees plus $0.185 million recovery for General Unsecured Claim amortization.[3]

26. In my judgement, evaluating the Debtor's business *as a going concern,*[4] which includes all of the intangibles such as goodwill and similarly was to continue the business uninterrupted, assessing several valuation ranges, and provided the projections are reasonable accurate, combined support that the JVK NY business as of the Post-Effective Date is worth more

---

[3] See Schedule 1m1 and 1m2 in the 10/15/2025 Disclosure Statement
[4] A "going concern" is a business that is financially stable and is expected to continue operating indefinitely.
See https://www.investopedia.com/terms/g/goingconcern.asp

than $6.9 million.  Again, this Flash Valuation assumes a marketing process outside of a Chapter 11 run by a competent investment banker to a broad investor/buyer universe over a reasonable period of time.

27.      As for the "New Value" being provided in connection with the proposed $1.773 million infusion as outlined in the POR and JVK-MediServ Settlement, I determined that the capital contribution by the old equity holders are new, substantial, money or money's worth (not future labor, goodwill, etc.), necessary for a successful plan of reorganization, and reasonably equivalent to the value of the property to be retained by old equity.

28.      In a hypothetical Chapter 7, after fees and expenses, senior lenders may see at best *de minimus* collections after the liquidation of assets. Without the fresh cash equity, Administrative expenses and General Unsecured Creditors ("GUC") would receive nothing, over 150 employees would lose jobs, and hospitals/health care facilities would have to scramble to find replacement service and support.

29.      This fresh cash equity capital allows JVK-NY to implement a POR paying secured creditors over $4.0 million in full, settles the FLSA claim at $1.1 million, and gets GUC recoveries of approximately $1.3 million in the aggregate, for a total plan repayment schedule to creditors of $5.327 million, plus payment of Administrative Claims of professionals.[5]

30.      The $1.773 million of new cash equity is necessary to make this a feasible POR based on the projection I have reviewed. Without the new cash, the amounts necessary to cure unexpired leases, honor commitments to secured lenders (including adequate protection and other fees), pay

---

[5] Source: description in 10/15/2025 POR and Exhibit A JVK-MediServ charts.

Administrative Claims including professionals, and provide much needed working capital, would not exist. The estate would fail. This critical fresh cash is coming in to implement the Plan and not to preserve previous equity interests.

31.      As it stands today, the current shareholder equity value in liquidation is effectively zero, and "sweat equity" has been rejected as a replacement for New Value. The New Value of $1.773 million is substantial, fresh, payable in cash, and necessary for a successful reorganization. As it affects absolute priority, there is precedent in other bankruptcy courts to support New Value "where the equity holders make a substantial contribution."[6]

32.      It is the Debtor's contention that the "New Value" which the holders provide and upon which the POR relies, meets the requirement for substantial contribution. Further, it is my opinion that the $1.773 million in fresh capital is more than reasonably equivalent to the value of any property retained by old equity, as it is "new, substantial, money or money's worth (not future labor, goodwill, etc.), (absolutely) necessary for a successful plan of reorganization, and reasonably equivalent to the value of the property to be retained by old equity."[7]

33.      Fact: in the Reorganized Debtor, previous ownership losses its controlling interest.

34.      In my opinion the POR meets the Best Interest Test.

35.      Should I be called to testify, my testimony would be consistent with the above.

---

[6] See further, In re 8315 Fourth Ave. Corp., 172 B.R. 725 (1984) (Case No. 191-15829-260 (CBD))
[7] See further IN RE COLTEX LOOP CENTRAL THREE PARTNERS, L.P United States Court of Appeals, Second Circuit. Feb 19, 1998

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 25, 2025          */s/ Jeffrey R. Manning*
Arnold, Maryland                   Jeffrey R. Manning, Sr., CTP
                                   Senior Managing Director
                                   The Silver Birch Group, Inc.
                                   (917) 549-0312
                                   jrmanning@silvrbirch.com

# NEW VALUE REPORT

**PREPARED BY**

## Jeffrey R. Manning, Sr., CTP
**Senior Managing Director of The Silver Birch Group, Inc.**

**for**
**SPENCE LAW OFFICE, P.C.**
**regarding the proposed**
**MODIFIED THIRD AMENDED**
**Plan of Reorganization of**
**JVK Operations Limited**
**[Case No. 24-70799 (REG)]**



**November 26, 2025**
**Public Stock Data as of November 4, 2025**



# Table of Contents



Title Page………………………………………………………………………...i
Table of Contents…………………………………………………………………..ii
Schedule of Charts & Exhibits………………………………………………. iii

   I.     Qualifications................................................................................................     1
  II.    Nature of Engagement................................................................................     2
          A.  New Value & Best Interest Test ..........................................................     5
          B.  Feasibility Test......................................................................     6
 III.   Market Test – The April 8, 2025 Auction....................................................     7
 IV.   Report Conclusion Summary.......................................................................     8
          A. "Floating Boxes".............................................................................     10
          B.   Liquidation................................................................................     11
               i.   Caveat Regarding Personal Guarantees...................................     12
          C.  The Industry & Public Company Benchmarks ...........................     13
          D.  M&A Comparables ...............................................................     14
          E.  The DCF Analysis with WACC & Terminal Value....................     15
   V.    Assumptions & Limits.................................................................................     17
  VI.   Right to Supplement....................................................................................     17
 VII.   Certification.................................................................................................     18

## SCHEDULE OF CHARTS USED IN REPORT

*Chart 1:*    *Floating Boxes*
*Chart 2:*    *Liquidation Analysis*
*Chart 3:*    *Hypothetical Ch. 7 Liquidation vs. Total Debt Claim*
*Chart 4:*    *Public Company Peer Group after Discounts*
*Chart 5:*    *JVK NY Disclosure Statement Projections*
*Chart 6*    *Benchmarking  JVK NY M&A Opportunity*
*Chart 7:*    *DCF Analysis, WACC & Terminal Value*

## SCHEDULE OF EXHIBITS

*Exhibit A -*   *Information Considered & Sources Reviewed*

*Exhibit B -*   *Public Company Peer Group*

*Exhibit C – curriculum vitae of J.R. Manning, Sr., CTP*

# I.    <u>QUALIFICATIONS</u>

My name is Jeffrey R. Manning, Sr., and I am the Founder and Senior Managing Director of The Silver Birch Group, Inc. ("SBG"), maintaining an office outside of Annapolis, MD. Through my relationship as a Registered Representative of BA Securities, LLC, I remain licensed as an investment banker with the Financial Industry Regulatory Authority, Inc. ("FINRA").

Since beginning my corporate finance career over 40 years ago, I have worked in commercial banking, corporate finance, operating restructuring, value investing, fixed income trading, and investment banking.  In 2024 I was recognized by <u>The M&A Advisor</u> for my work as the "Outstanding Investment Banker" on Winc, Inc., a transaction selected as the "Sale of the Year" (in the $10-$50 million category).  I have also been recognized as an "Outstanding Investment Banker" by <u>Turnaround & Restructuring Magazine</u> in 2017, 2018, 2020, and 2023, and over the past two decades I have appeared regularly on <u>The Deal</u> "League Tables."

The Turnaround Management Association ("TMA") designates me as a Subject Matter Expert in two areas – Valuation in Bankruptcy and Sale of Assets under the U.S. Federal Bankruptcy Code (§363 Sales).

To provide investment banking services, I have earned the following FINRA licenses: Series 7 -- General Securities Representative, Series 63 -- Uniform Securities Agent State Law, Series 24 -- General Securities Principal, and Series 79 -- Investment Banking Representative.  It is my understanding that fewer than ten professionals qualify with both a FINRA Series 24 license and the Certified Turnaround Professional ("CTP") designation from the Turnaround Management Association. During my career I have completed over 150 engagements.

I have provided expert testimony and expert reports in dozens of jurisdictions in the Federal U.S. Bankruptcy Courts, in addition to expert reports for United States Attorney's Offices on various matters in the SDNY, EDNY, and the EDPA. My testimony record and published byline articles are extensive and available upon request.

My undergraduate BA degree in Economics & Political Science is from Yale University and my MBA in Business Economics & Finance is from Columbia University School of Business.

Information that I considered in preparing this Report is summarized in Exhibit A.

II.    **NATURE OF ENGAGEMENT**

Effective January 14, 2025, The Silver Birch Group, Inc. ("SBG") was retained by the court to  act as the investment banker for JVK Operations Limited [Case No. 24-70799 (REG)] .

**A.   New Value & Best Interest Test**

At the request of Debtors' counsel, the Spence Law Office, P.C., SBG was asked to prepare a report to assess the best interests of creditors test ("Best Interest Test").  This test generally applies to individual dissenting holders of impaired claims, and is customarily satisfied by a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical Chapter 7 liquidation against the estimated recoveries under the proposed plans of reorganization.

The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical Chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the proposed plan of reorganization that rejects the plan.

SBG uses **Flash Valuations** in connection with the Best Interest Test.[1] Flash Valuation estimates reflect on current capital market conditions and are used to guide a potential marketing process run by a competent investment banker to a broad investor/buyer universe over a reasonable period of time.  Flash Valuation attempts to address where assets are likely to "trade." By comparing and contrasting several methodologies, Flash Valuation attempts to "triangulate" a consensus.  The work product is typically presented to a Board of Directors or Senior Management evaluating M&A activities or considering a capital market effort or liquidity event.

Flash Valuation does NOT comply with requirements set forth by the American Institute of Public Accountants on the Accounting Standard Codification ASC 718.  However, since 1999, I have made numerous presentations using this approach.  I have delivered expert opinions using the Flash Valuation methodology in Federal Bankruptcy Courts most recently in the Harbor Business Compliance Corporation Plan of Reorganization efforts relating to Firstbase.io, Inc. (Case Number: 24-11647) and 4D Factory, Inc. *et al* (Case no. 23-11618 MEW).

Flash Valuation has also been used in Greensill Capital (Case Nos. 20-71970 thru 20-71975(AST)), MBF Inspection Services Inc. (Case No. 18-11579-11), Reddy Ice Holdings, Inc. (Case No. 12-32349-11), amongst several others. Flash Valuation methodology also forms the basis of my opinions in litigation: i) U.S. SBA ELK Association Funding Corp, as Receiver (case no. 17-CV-3586-JS-JMW) in the U.S. District Court Eastern District of New York, representing the U.S. Small Business Administration, and ii) U.S. v. Joshua Coleman, 23-cr 351 (KBH) in the Eastern District of Pennsylvania.

Over my 40+ year career, I have submitted scores of Expert Reports, delivered Expert Testimony over thirty times in more than eighteen venues of the U.S. Federal Bankruptcy Court, and appeared twice in U.S. Federal Courts.

---

[1] For the purpose hereunder, a "Flash Valuation" report examines and compares broadly recognized and widely accepted valuation methodologies to determine a value at which assets would likely transact between a willing buyer and a willing seller, when neither party is under any compulsion to act and both parties have reasonable knowledge of relevant facts.  It does not intend to comply with requirements set forth by the American Institute of Public Accountants on the Standards for Valuation Services.

### B.    Feasibility Test -- Section 1129(a)(11) of the Bankruptcy Code

The so-called "feasibility test" requires that confirmation of a plan is not likely to be followed by liquidation of the Debtor(s), unless such liquidation is proposed in the plan.[2] In applying the feasibility test, the Court must determine whether the plan may be implemented and whether it has a reasonable likelihood of success.[3]

In determining standards of feasibility, bankruptcy courts have identified the following probative factors:

1)    the adequacy of the capital structure;
2)    the earning power of the business;
3)    the underlying economic conditions;
4)    the ability of management;
5)    the probability of the continuation of the same management; and
6)    any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

Although in my primary role is as the Debtor's investment banker – i.e., focusing on the marketing and auction process plus advising on valuation issues -- over 20 years ago, based upon my four years of operating restructuring efforts, I earned the Turnaround Management Association's Certified Turnaround Professional credential.[4] Over the past year I have observed the JVK/RMK senior management team.

I have been impressed with the underlying operations.  Addressing the probative factors in order above:

1)    JVK NY POR's proposed debt to equity ratio is less than 2.9x, which suggests the Post-Effective Reorganized Debtor is not overleveraged.[5]  Of course, future sales growth depends on additional future growth capital, which cannot be determined at this time.  Additional capital would permit JVK to expand into the "Rental Business," which would likely generate materially stronger revenue growth;
2)    Over the past five years JVK has generally operated on a cash positive basis, setting aside the headwinds from COVID-19 and the distraction from bothersome litigation;
3)    Economic conditions remain relatively sound.  This past month Federal Reserve cut interest another quarter point and industrial/commercial laundry is not subject to tariff vicissitudes;
4)    Efforts to operate the business as a debtor-in-possession, especially following frustrating delays in the May 2025 close coming out of the auction, favorably demonstrated ability of management (see further the Rule 9019 MediServ-JVK Settlement Agreement dated October 11, 2025)[6];
5)    My understanding is that negotiations are underway with senior management to define roles in the Post-Effective Reorganized Debtor, as JVK's senior management is making new cash capital contributions for equity under the POR; and

---

[2] See 11 U.S.C. § 1129(a)(11).
[3] See United States v. Energy Res. Co., 495 U.S. 545, 549 (1990); In re Johns-Manville Corp., 843 F.2d at 649.
[4] See https://www.turnaround.org/certification-education/certification/
[5] Debt to Equity ratio of less than 3.0x represents less leverage than currently available in the senior loan market. [2.9x=Calculation 5,127/1,773]  See https://www.wallstreetprep.com/knowledge/ultimate-guide-to-debt-leveraged-finance/
[6] Medi-Serv Global USA Inc. ("Medi-Serv") was the initial Stalking Horse and was declared the prevailing party at the April 8, 2025 Auction.

6) Negotiations with senior lenders and other stakeholders have been underway to provide the Reorganized Debtor further runway to operating stability.

In summary, the *de facto* Chief Operating Officer Joseph E. Samuel has done a remarkable job managing activities and cash flows following the cancellation of the sale to Medi-Serv.  Vinny Samuel brings his years of technical expertise to design and operations, and Mike and Mathew Connell support the marketing efforts for healthcare and hospitality.  Together, these four senior managers anchor a solid business reputation in the tri-state area.  At the Post-Effective Date, Medi-Serv's Blaise Vas will bring additional management depth, seasoned leadership, and practical experience in the industrial/commercial laundry business to the Reorganized Debtor.

## III.    MARKET TEST – THE APRIL 8, 2025 AUCTION

Famed academic Burton G. Malkiel noted, "Nobody knows more than the market," which is another way to say that an active market process always provide the most accurate measure of "value."[7]

Pursuant to Court approved Bidding Procedures dated March 12, 2025 (ECF No. 193), Silver Birch assisted the Debtor marketing the Assets in a number of ways.  In addition to published notice on an industry website, the business social media site LinkedIn generated 1,150+ "impressions" noticing the sale, generating several reverse inquiries from possible bidders. Silver Birch contacted and served by telephone and email notice of Auction Sale, Order approving the Terms and Conditions of Sale, and approved Terms and Conditions to over forty (40) prospective purchasers, including strategic and private equity buyers. Strategic buyers included key industry contacts interested in the tri-state New York market.

Going into the final marketing week six parties were conducting active due diligence. Ultimately two submitted Qualified Bids at the Bid Deadline.  The Auction was held on April 8, 2025, and by the end of the day, in Debtor's considered business judgment, the "highest and best" alternative generated $5.387 million for JVK NY, including approximately $5.0 million in senior debt – with the majority of this senior debt reflecting negotiated compromise between sophisticated parties. The active marketing process at auction improved potential recoveries to the Debtor estate in excess of 12%.

Based upon my 40+ years if corporate recovery experience, I believe that the marketing of this opportunity was conducted with a broad market test, in good faith, and on an arms-length basis.

Results of the Market Test is shown as the solid red line on the Floating Box chart below.

---

[7] See further "Res tantum valet quantum vendi potest. (A thing is worth only what someone else will pay for it.)" Malkiel, Burton Gordon, A Random Walk Down Wall Street: The Time-Tested Strategy for Successful Investing, W. W. Norton & Company, Inc., 1973.

## IV.    REPORT CONCLUSION SUMMARY

The viability of this Plan of Reorganization ("POR") depends upon an infusion of fresh cash capital of $1.773 million that preserves JVK NY as a "going concern."[8] As the body of this report details, considering a variety of valuation methods, this fresh cash under the POR is clearly a superior alternative compared to estimated recoveries for a Debtor's stakeholders in a hypothetical Chapter 7 liquidation.

This POR clearly meets the Best Interest Test.

In a hypothetical Chapter 7, after fees and expenses, senior lenders may see at best *de minimus* collections after the liquidation of assets, the sale of contracts, and even after aggressively pursuing personal guarantees.  Without the fresh cash equity, Administrative expenses and General Unsecured Creditors ("GUC") would receive nothing, over 150 employees would lose jobs, and hospitals/health care facilities would have to scramble to find replacement service and support.

This fresh cash equity capital allows JVK-NY to implement a POR paying secured creditors over $4.0 million in full and GUC approximately $1.3 million in the aggregate, for a total plan repayment schedule to creditors of $5.327 million, plus payment of Administrative Claims of professionals.[9] The $1.773 million of new cash equity is necessary to make this a feasible POR based on the projection I have reviewed.

Without the new cash, the amounts necessary to cure unexpired leases, honor commitments to secured lenders (adequate protection and other fees), pay Administrative Claims including professionals, and provide much needed working capital, would not exist.  The estate would fail.

This critical fresh cash is coming in to implement the Plan and not to preserve previous equity interests.

As it stands today, the current shareholder equity value in liquidation is effectively zero, and "sweat equity" has been rejected as a replacement for New Value.  The New Value of $1.773 million is substantial, fresh, payable in cash, and necessary for a successful reorganization.

As it affects absolute priority, there is precedent in other bankruptcy courts to support New Value "where the equity holders make a substantial contribution."[10] It is the Debtor's contention that the "New

---

[8] A "going concern" is a business that is financially stable and is expected to continue operating indefinitely. See https://www.investopedia.com/terms/g/goingconcern.asp

[9] source: description in 10/15/2025 POR and Exhibit A JVK-MediServ charts.

[10] See further, In re 8315 Fourth Ave. Corp., 172 B.R. 725 (1984) (Case No. 191-15829-260 (CBD))

Value" which the holders provide and upon which the POR relies, meets the requirement for substantial contribution.

Further, it is my opinion that the $1.773 million in fresh capital is more than reasonably equivalent to the value of any property retained by old equity, as it is "new, substantial, money or money's worth (not future labor, goodwill, etc.), (*absolutely*) necessary for a successful plan of reorganization, and reasonably equivalent to the value of the property to be retained by old equity."[11]

Fact: in the Reorganized Debtor, previous ownership losses its controlling interest.

To reiterate, evaluating several broadly accepted valuation methodologies, the POR representing $6.9 million in value for JVK Operations Limited clearly meets the Best Interest Test. The $6.9 million is shown in the solid blue line on the Floating Boxes chart below.

---

[11] See further IN RE COLTEX LOOP CENTRAL THREE PARTNERS, L.P United States Court of Appeals, Second Circuit. Feb 19, 1998

A.  THE FLOATING BOXES



*Chart 1: JVK Floating Boxes*

| Methodologies | Liquidation | M&A | Public Peer Group | DCF |
|---|---|---|---|---|
| HIGH | $1,349 | $10,144 | $15,591 | $17,500 |
| LOW | $711 | $6,763 | $10,394 | $14,062 |
| Valuation as of | 11/4/2025 | 11/4/2025 | 11/4/2025 | 11/4/2025 |

**Commentary**

The Floating Box presentation, sometime referred to as the "Football Field," shows valuation ranges using several widely accepted methodologies.  SBG contends the underlaying Floating Box chart above yields a consensus of valuation materially in excess of the **U.S.$6.9 million POR Value**, weighting M&A Comps, comparing Trailing Twelve Months ("TTM") Revenue Projections versus current Public Trading Comps, and applying the Discounted Cash Flow ("DCF") based upon the financial projections presented in the Disclosure Statement.

"Flash Valuation" attempts to reflect the current capital markets to assess and predict the price that a transaction would likely occur after a competent marketing process led by professionals over an appropriate amount of time.  By testing, contrasting, and comparing several broadly accepted valuation methodologies, Flash Valuation attempts to "triangulate" an emerging consensus for an estimate of "valuation."

### B.    LIQUIDATION ANALYSIS

| sources: Recent MORs & Disclosure Statement Liquidation | Oct 31, 2025 $000s | | % Assumption | LOW | % Assumptio | HIGH |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Cash | $ | 100 | 100% | $ 100 | 100% | $   100 |
| Accounts Receivable | $ | 500 | 50% | $ 250 | 85% | $   425 |
| **Total Current Assets** | $ | 600 | | $ 350 | | $   525 |
| Equipment | $ | 1,500 | 10% | $ 150 | 50% | $    0 |
| Avoidance Actions | $ | 400 | | | | |
| **LargeKey Contracts (2)** | $ | 500 | | | | |
| 2025) | $ | 350 | | | | |
| Contracts, Trademark & Other IP (2) | $ | 850 | 20% | $170 | 70% | $595 |
| **Potential Value of PGs** | $ | 1,200 | 10% | | 25% | |
| **TOTAL ASSETS** | $ | 4,550 | Gross Recovery | $ 790 | | $ 1,420 |
| | | | Trustee Fees (10.0%) | ($79) | | ($142) |
| | | | Ch. 7 Liquidation Recovery | $ 711 | | $ 1,278 |

(2) source: Customer List as of 01/06/2025

*Chart 2-  Liquidation*

## CAVEAT REGARDING PERSONAL GUARANTEES

As is often the case with middle market companies, the owners/senior management are frequently required to provide personal guarantees ("PGs") on the obligations of these operations.  Senior lenders may, or may not, pursue PGs on a case by case basis.   SBG has not reviewed, examined, or confirmed the validity or enforcement of these alleged PGs, nor does SBG have any insight into whether a lender would pursue PGs in the future.

However, a core question in evaluating the Best Interest of Creditors test is whether stakeholders are better off pursing Chapter 7 liquidation, which may include moving against the PGs.

At the July 14, 2025 JVK Hearing it was reported that current senior partners are investing fresh cash equity obtained from owned real estate as a part of funding of their equity contribution to support the new POR.

Considering NJ liabilities and related non-debtor obligations as a practical matter, the JVK NY POR materially wins.  As the chart below shows, the test is not close, aggregating over $7.5 million shortfall.



*Chart 3-  Hypothetical Ch. 7 Liquidation vs. Total Debt Claim*

## Commentary

Liquidation Analysis nearly always produces the lowest range of values.  The methodology assumes the underlying value of a company's individual assets alone, ignoring liabilities and uses an estimate of assets, as close as possible to the valuation date, as a basis for determining value.

The methodology estimates the fair market value of the assets in an orderly liquidation scenario over a relatively brief timeframe (not "forced" liquidation value). A business operating as a going concern generates materially higher ranges of value.  SBG ascribed value to the Debtor's contracts, trademarks, and other IP. JVK NY remains one of the three largest independent industrial/commercial laundries in the tri-state New York market place, representing a major competitive factor.

**THE INDUSTRY & PUBLIC PEER GROUP BENCHMARKS**

| | | | Discount to Public Company | |
|---|---|---|---|---|
| TTM Median Peer | 2.2 | TTM 10/2025 | 60% | 40% |
| JVK TTM Revenue | | $ 11,938 | $10,394 | $15,591 |

| source: MarketWatch Stock Price 11/4/2025 |
|---|

*Chart 4- Peer Group after Discount to Public Companies*

**Commentary**

The independent commercial laundries industry is highly fragmented and generally geographically specific, primarily made up of small privately-held companies often still in the control of founders. Several attempts over the years by Private Equity to "consolidate" the industry has generally been unsuccessful.

While few publicly traded companies were a "perfect" fit for the Debtor, using search criteria from **MarketWatch™**, SBG compiled a list of "proxies" to benchmark JVK for a public market sounding. Details of this proxy list are found on Exhibit C.



## C.  ASSESSING M&A TRANSACTIONS

| Fiscal Year (000s) | JVK Operations Ltd. NY Projections | | | | |
|---|---|---|---|---|---|
| | 2026 | 2027 | 2028 | 2029 | 2030 |
| Revenue | $16,088 | $17,127 | $17,634 | $17,810 | $17,988 |
| Gross Profit | $4,688 | $6,273 | $5,541 | $5,596 | $5,652 |
| GPM% | 29.1% | 36.6% | 31.4% | 31.4% | 31.4% |
| | | | | | |
| EBITDA | $1,969 | $1,472 | $2,656 | $2,683 | $2,710 |
| Free Cash Flows | $1,378 | $3,108 | $4,968 | $6,846 | $1,897 |

source: JVK Operations Ltd. et.al. (NY) Disclosure Statement filed Nov 2005

*Chart 5  JVK NY Disclosure Statement Projections*

| JVK POR | | | |
|---|---|---|---|
| **Free Cash Flow Projections (in $000s)** | $7,356 | | NPV to WACC |
| **Multiple Ranges in 5 Years** | 6.0x | $44,137 | $10,144 |
| | 5.0x | $36,781 | $8,453 |
| | 4.0x | $29,425 | $6,763 |

source: JVK (NY) Disclosure Statement filed Nov 2025

**WACC**   34.19%

*Chart 6  Benchmarking  JVK NY M&A Opportunity*

## Commentary

SBG's view on the U.S. economy and the current capital market remains well-summarized in the still relevant and crisp "M&A activities have recovered since recent rate increases from the Fed stabilized at 5.25% to 5.50% in July 2023."[12]  In October, the Federal Reserve Bank lowered the Fed Fund rate by 0.25% to a current value of 3.75-4.0%, and "U.S. M&A values, spurred by larger, less frequent deals and rising private equity activity, despite market uncertainty."[13]

---

[12] Derek Nacionales, The State of Enterprise SaaS M&A, Pitchbook Data, Inc., July 18, 2024, p. 2.
[13] Mitch Berlin, EY Americas Vice Chair, EY-Parthenon, https://www.ey.com/en_us/insights/mergers-acquisitions/m-and-a-activity-report

To benchmark a possible M&A transaction in the current market, without the overhang of a recent bankruptcy and the distraction from litigation, using middle market multiple range brackets of 4.0x to 6.0x, brought back to the current year using the Weighted Average Capital Cost outline in the DCF section below, SBG posits JVK NY might trade today in a range of $8.5 million to $10.1 million.

### E. DISCOUNTED CASH FLOW

## JVK Operations Ltd. NY
### DCF Range of Value

| (000s) | | | |
|---|---|---|---|
| PV Discrete Cash Flows | $7,356 | | |
| PV Terminal Value (DFC) | $6,706 | | |
| Terminal Value M&A | $10,144 | LOW | HIGH |
| DCF Enterprise Value | | $ 14,062 | $ 17,500 |

## JVK Operations Ltd. NY

| Weighted Average Cost of Capital | | Calculating Terminal Value | | |
|---|---|---|---|---|
| Risk Free Rate 9/28/2025 (1) | 3.71% | Revenue Projection to Nov 2030 (6) | $ | 17,988 |
| Equity Risk Premium (2) | 6.45% | Revenue Multiple (Public Comp) | | 2.2 |
| Industry Risk Premium (3) | 1.74% | Terminal Value at Five Year Exit | $ | 39,156 |
| Small Stock Risk Premium (4) | 7.29% | | | |
| Company Specific Risk Adjustment (5) | 15.00% | | | |
| WACC | 34.19% | PV Terminal Value in Five Years at WACC | $ | 6,706 |

(1) US Five Year Treasury  11/10/2025            (6) source: Projections from  Disclosure Statement

(2) Kroll Cost of Capital Navigator, Supply Side

(3) Kingscrowd Risk Premium Report of SaaS

(4) Kroll Cost of Capital Navigator, 10th Decile

(5) SBG Estimate of Company Emerging in BK

*Chart 7* Valuation, *WACC & Terminal Value*

**Commentary**

In the case of private securities, certain broadly accepted methods examine financial projections and use the discounted cash flow analysis.

DCF is taught extensively in finance and MBA programs.  In all cases, in the case of privately held companies, analysts have discretion determining the Weighted Average Cost of Capital ("WACC")[14] and estimating Terminal Value.

Since DCF reflects the assumptions used in the calculations, it is often the highest valuation method. However, in the case of this Flash Valuation, the "Floating Boxes" are reasonable consistent with each other, which gives additional confidence to the conclusion.

---

[14] Weighted Average Cost of Capital (WACC) derives from the Capital Asset Pricing Model (CAPM).  This valuation framework was developed by Jack Treynor, William Sharpe, John Lintner and Jan Mossin built on earlier work by Harry Markowitz and Merton Miller.  CAPM remains influential today, as Sharpe, Markowitz and Miller shared a Nobel prize for economics.

## IV.    ASSUMPTIONS & LIMITING CONDITIONS

➢ **Use of Report** – This Report is prepared solely for the purpose stated and should not be used for any other purpose.

➢ **Scope of Analysis** – Estimating the value of any asset, financial instrument, or operating business is a matter of informed judgment. The accompanying Report has been prepared on the basis of information provided and assumptions set forth in the document.

➢ **Nature of Opinion** – This Report is not to be construed as: i) a "fairness opinion" as to the fairness of any actual or proposed transaction, ii) a "solvency opinion;" or iii) an "investment recommendation."   For various reasons, the price at which these assets might transact in a specific trade between parties on a specific date might be significantly different from the values as expressed in the Flash Valuation.

➢ **Subsequent Events** – I have no obligation to update this Report or to revise the valuation because of events and transactions occurring subsequent to the date hereunder.

## V.    RIGHT TO SUPPLEMENT

The opinions and conclusions presented in this Report are based on the information reviewed to date. Should additional relevant information or documents be produced at a later date, my opinions and conclusions may be influenced by this future information.  If additional documents are provided to me, I reserve the right to amend this Report.

## VI.    CERTIFICATION

I hereby certify that to the best of my knowledge and belief:

➢ The statements contained in this Report are true and correct.

➢ The reported analyses, opinions and conclusions are my personal, impartial, and unbiased professional analyses, opinions, and conclusions; limited only by the reported assumptions and limiting conditions.

➢ I have no present or prospective interest in the Debtor that is subject of this Report, and I have no personal interest with respect to the parties involved.

➢ I have no bias with respect to the subject of this Report or to the parties involved with this assignment.

➢ This engagement was not contingent upon reporting any predetermined results.

➢ My compensation for is not contingent upon any predetermined outcome.

Respectfully Submitted,


Jeffrey R. Manning, Sr., CTP
Senior Managing Director
Effective November 15, 2025

# EXHIBITS

# EXHIBIT A

## Information Considered Preparing this Report

1. Modified Third Amended Disclosure Statement for the Modified Third Amended Chapter 11 Plan of Reorganization of JVK Operations Ltd.
2. Internal Management Trailing Twelve Months P&L for JVK (NY) 11/10/2025
3. MarketWatch™ Data Inquiry on Publicly Traded Corporate Laundry & Related Companies
4. Malkiel, Burton Gordon, A Random Walk Down Wall Street: The Time-Tested Strategy for Successful Investing, W. W. Norton & Company, Inc., 1973.
5. Weighted Average Cost of Capital (WACC) derives from the Capital Asset Pricing Model (CAPM).  This valuation framework was developed by Jack Treynor, William Sharpe, John Lintner, and Jan Mossin built on earlier work by Harry Markowitz and Merton Miller.
6. Valuation of Portfolio Company Investments of Venture Capital and Private Equity Funds and Other Investment Companies guide (the "AICPA Guide");

# EXHIBIT B

## Public Company Peer Group

### Publicly Traded Corporate Laundry & Related Companies

| name | symbol | price | Market Cap MM | TTM Revenue (MM) | TTM Rev Multiple | Company Profile |
|---|---|---|---|---|---|---|
| Alliance Laundry | ALH | $ 26.30 | $5,290 | $1,508 | 3.5 | Alliance Laundry Systems IPO. The commercial laundry equipment company said Friday in a filing with the Securities and Exchange Commission that it intends to list its stock under the ticker ALH on the New York Stock Exchange. |
| Aramark Corporation | AMRK | $ 37.50 | $9,880 | $17,880 | 0.6 | Aramark engages in the provision of food, facilities, and uniform services. It offers food services, facilities management, uniform services, refreshments, hospitality management, and supply chain services. It operates through the Food and Support Services United States (FSS United States), and Food and Support Services International (FSS International) segments. |
| Cintas Corporation | CTAS | $ 183.13 | $73,160 | $10,560 | 6.9 | Cintas Corp. engages in the provision of corporate identity uniforms through rental and sales programs. It operates through the following segments: Uniform Rental and Facility Services, First Aid and Safety Services, and All Other. |
| EnviroStar | EVI | $ 27.30 | 330 | 389.8 | 0.8 | EVI Industries, Inc. engages in the provision of advisory and technical services. The firm is also involved in selling and leasing commercial laundry equipment specializing in washing, drying, finishing, material handling, water heating, power generation, and water reuse applications to customers. The company was founded on June 13, 1963 and is headquartered in Miami, FL. |

| | |
|---|---|
| Median | 2.2 |

| | TTM 10/2025 | 60% | 40% |
|---|---|---|---|
| JVK TTM Revenue | $ 11,938 | $10,394 | $15,591 |

source: MarketWatch Stock Price 11/4/2025

# Jeffrey R. Manning, Sr. CTP

Arnold, Maryland USA
jrmanning@silvrbirch.com
M: 917.549.0312

**Silver Birch Group**                                                                                          Arnold, MD

*Founder & Senior Managing Director,* November 2023 to present.  Providing investment banking services and corporate finance advice to assist middle-market companies and their stakeholders find effective solutions for corporate recovery. This FINRA licensed special situations effort focuses on out-of-favor or storied companies, often operating at, near, or in bankruptcy.  Emphasis on §363 sales, "story" M&A, valuation of bankrupt companies, and private placements.  Significant experience testifying in court in over 18 Federal jurisdictions. Over a 40+ year corporate finance career, have closed 150+ transactions across multiple industries, including Manufacturing & Distribution, Hospitality, Renewable Energy, Consumer & Retail, Healthcare, Digital Media, and Real Estate. Please see further https://www.silvrbirch.com/.

**CohnReznick Capital Market Securities, LLC**                                                          Baltimore, MD

*Managing Director,* 2014 to October 2023. Led special situations practice at CohnReznick Capital, the affiliated FINRA-licensed investment bank of CohnReznick, LLP.   Worked closely with CohnReznick's Restructuring and Dispute Resolution Services consultants to bring creative capital market solutions to clients.

**BDO Capital Advisors, LLC**                                                          Costa Mesa, CA and New York, NY

*Managing Director,* 2007 to 2014.  Headed special situations practice at BDO Capital (f/k/a Trenwith Group), the wholly-owned investment bank of BDO USA LLP.   Member of Investment Banking Executive and Engagement Committee.

**FTI Capital Advisors, LLC**                                                                                  Washington, DC

*Chief Executive Officer,* 2003 to 2007.  Chief Executive Officer, Supervisory Principal, and Senior Managing Director of the wholly-owned FINRA-licensed investment bank of FTI Consulting, Inc.  While based in DC, recruited eight senior bankers in New York, DC, Dallas, San Francisco, and Los Angeles -- a boutique investment bank with capabilities in private placements, M&A Advisory, and strategic alternatives for healthy companies as well as special situations.

**Legg Mason Wood Walker, Incorporated**                                                              Baltimore, MD

*Managing Director,* 1999 to 2003.  Headed special situation practice and executed private placements for Legg Mason, a FINRA licensed NYSE financial institution with middle market focus.  Member of the Fairness Opinion Committee.

**Rodman & Renshaw, Inc.**                                                                                    New York, NY

*Managing Director,* 1996 to 1999.  Focus on distressed debt, Mexican cross-border, and private placements.  Primary duties included structuring and marketing private placements, developing Mexican "Good Bank/Bad Bank" strategy for Confia, S.A., and marketing and trading fixed income, distressed securities, and special situation private paper.  Member of Executive, Engagement, and Fairness Opinion Committees.

**Schroder Wertheim & Co., Incorporated**                                                              New York, NY

*Senior Vice President, Global Bank Debt*, 1994 to 1995. Started distressed debt-trading operation for Schroder Wertheim, a subsidiary of Schroder Plc.  Duties included creating trading protocols, recruiting team, and sourcing product in the US, United Kingdom, and mainland Europe.  Started trading bank debt at S.N. Phelps & Co. in 1992.

**The Dun & Bradstreet Corporation**                                                                    New York, NY

*Assistant Vice President*, with various corporate finance assignments from 1987 to 1992.  Duties included 1) developing budget and strategic plan,  2) designing and implementing over $394 million in operating restructuring actions; and 3) providing finance support for strategic alliance negotiations with key European and U.S. partners associated with M&A and divestitures.

**Manufacturer Hanover Trust Company**                                                              New York, NY

*Assistant Vice President*, and various assignments from 1981 to 1987. After completing the MHTCo. Credit Training program, primary duties included calling officer for large corporate accounts.  Moved to loan workout in 1983.

## EDUCATION AND CERTIFICATIONS
**Columbia University**, M.B.A., Business Economics, Finance, 1986.
**Yale University**, B.A., Economics & Political Science, 1981.

**Manufacturers Hanover Trust Co Credit Training,** September 1981 to June 1982 **Turnaround Management Association,** Certified Turnaround Professional, Chicago, IL, 2006. **Center for Creative Leadership Development,** Colorado Springs, CO, 1992.
**Colgate University Writer's Conference,** Hamilton, NY, Summer 2022.

Certified Turnaround Professional from the Turnaround Management Association FINRA Licensed General Securities Principal (Series 24) Limited Representative Investment Banking (Series 79) Registered Representative (Series 7 & 63)

## PERSONAL
Married to Laura Beatty Manning, raised five children, now ages 26 to 35 years. Grandkid count = 5

## BOARD, HONORS, AND CHARITY AFFILIATIONS
Board Member, TMA Chesapeake ChapterChapter, 2022 to present
Chair, Budget & Planning, Financial Advisory Board, Episcopal Diocese of Maryland, 2022 to present
*ex officio*, Property Committee, Episcopal Diocese of Maryland, 2022 to present Co-Chair, Yale College Class of 1981 40th Reunion Committee.
Ivy League Football Association, Scribe & Dinner Vice Chairman, since 2008 to present.
Class Officer, Yale College Class of 1981, 2011 to the present.
Mynderse Academy Athletic Hall of Fame, Inductee 2015.
Yale College Class of 1981 Distinguished Service Award, 2006.
Chair, Yale College Class of 1981 25th Reunion Committee.
Co-Chair, Yale College Class of 1981 20th Reunion Committee.
Yale Spizzwinks (?) Alumni Association, Co-Founder and Moderator, 2003 to 2016. Hartford-Baltimore County Youth Football Coach (Cockeysville), 2002 to 2014.
The Yale Club of New York City, Council Member, 1999 to 2002.
The Yale Club of New York City, House Committee, 1988 to 1996. Saint Luke's Episcopal Church, Darien, CT, Vestry, 1996 to 1999.
Stephen Minister, from Stephen Ministries© of St. Louis, Missouri, 1997 to 1999. The University Glee Club of New York City, various Board Roles, 1985 to 1997.
Yale Club of NYC Scholar, 1981.

Jeff is a published novelist and poet, a frequent contributor, and speaker at industry and university events – including the TMA Journal of Corporate Renewal, National Law Review, Columbia Business School, Johns Hopkins, and Darden School at UVA. He authored a ChapterChapter for the Thomson Reuters book "Avoiding Financial Trouble."

Manning is one of the few FINRA S24/S79 investment bankers with the Certified Turnaround Professional designation. TMA has designated Jeff a Subject Matter Expert in two areas -- §363 Sales and Valuation in Bankruptcy.